UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NW YORK

---

UNITED STATES OF AMERICA

    - against -

                                 05 CR 613 (S-5)(JG)

KENNETH E. MAHAFFY, JR.,

      Defendant.

---

MEMORANDUM OF LAW IN SUPPORT OF KENNETH E. MAHAFFY, JR.'S MOTION
FOR DISMISSAL OF THE INDICTMENT OR, ALTERNATIVELY, FOR A NEW TRIAL

Andrew J. Frisch
*Attorney for Kenneth E. Mahaffy, Jr.*
950 Third Avenue, 15th Floor
New York, New York 10022
(212) 784-2413
(212) 888-0919 (facsimile)
afrisch@andrewfrisch.com

February 22, 2010

# TABLE OF CONTENTS

Table of Authorities ......................................................... iii

Introduction ..................................................................... 1

Statement of Facts ........................................................... 4

A.    Evidence and Leads to Evidence that Contemporaneous Dissemination    5
    of Squawks Was Permissible Even to Warren Fellus

    1.    Testimony about "Joe, last name unknown"    5
        at Mr. Mahaffy's two trials

    2.    SEC Testimony of Joseph Lauricella and Ronald Ledwith    9

    3.    The Prejudice to Mr. Mahaffy of the Non-Disclosure    23

B.    Evidence that Squawks Did Not Contain Confidential Customer    24
    Order Information

    1.    Brian P. Hull of Merrill Lynch    27

    2.    Leo Arthur Ressa of Merrill Lynch    29

    3.    Robert Moore of Smith Barney    32

    4.    Michael S. Legieza of Lehman Brothers    33

C.    Evidence that Only Sales and Position Traders Were Trained on What    35
    the Government Claimed Was the Sole Intended Use of Squawk, and
    that Each Retail Branch's Managers and Compliance Officers
    Determined How its Retail Brokers Should Use its Boxes

    1.    Jeffrey N. Edwards, deposed on September 28, 2006    37

    2.    Michael John Lynch, deposed on October 27, 2006    39

    3.    Mr. Ressa    43

    4.    Kathryn Curran, deposed on September 21, 2006    44

    5.    The Prejudice to Mr. Mahaffy of the Non-Disclosure    45

D.      Evidence that Attempting to Profit on Squawks Was, As Mr.          45
        Mahaffy Argued, a Fool's Errand

        1.      Mr. Lauricella                                            45

        2.      Dante Ferrarie, deposed on July 26, 2006                  47

        3.      Mr. Hull                                                  50

        4.      The Prejudice to Mr. Mahaffy of the Non-Disclosure        51

E.      Evidence that Mr. Amore Committed Perjury After Consummating
        His Cooperation Agreement                                         51

F.      Evidence and Leads to Evidence that, Contrary to the Inference
        Pressed by the Government, Mr. Mahaffy Did Not Provide Client
        Donald Lee With Contemporaneous Access to Squawk Broadcasts       55


ARGUMENT                                                                  59

        THE INDICTMENT OF MR. MAHAFFY SHOULD                              59
        BE DISMISSED WITH PREJUDICE

        1.      The scope of the Brady violation undermines confidence    59
                in the outcome of the case

        2.      Dismissal of the indictment is the proper remedy          65

## TABLE OF AUTHORITIES

**Cases**

Brady v. Maryland, 373 U.S. 83 (1963)  passim

Kyles v. Whitley, 514 U.S. 419 (1995)  59, 60, 62

Novasak v. Mazurkiewicz, 1995 WL 430603 (E.D. Pa. July 20, 1995)  62

United States v. Broward, 594 F.2d 345 (2d Cir, 1979), cert. denied, 442 U.S. 941 (1979)  67

United States v. Causey, 356 F. Supp. 2d 681 (S.D. Tex. 2005)  61

United States v. Chalmers, 410 F. Supp.2d 278 (S.D.N.Y. 2006) (Chin, J)  60

United States v. Gil, 297 F.3d 93 (2d Cir. 2002)  63

United States v. Holihan, 236 F. Supp.2d 255 (W.D.N.Y. 2002)  60

United States v. Jackson, 354 F.3d 59 (2d Cir. 2003)  58

United States v. Leroy, 687 F.2d 610 (2d Cir. 1982)  63

United States v. Locascio, 6 F.3d 924 (2d Cir. 1993)  60

United States v. Mahaffy, 283 Fed. Appx. 852 (2d Cir. 2008)  66

United States v. Orena, 145 F.3d 551 (2d Cir. 1998)  60

United States v. Payne, 63 F.3d 1200 (2d Cir. 1995)  60

United States v. Reyes, 577 F.3d 1069 (9th Cir. 2009)  61

United States v. Simmons, 581 F.3d 158 (3d Cir. 2009)  62

United States v. Triumph Capital, 544 F.3d 149 (2d Cir. 2008)  60

United States v. Trzaska, 111 F.3d 1019 (2d Cir. 1997)  58

United States v. Wallach, 979 F.2d 912 (2d Cir. 1992)  4, 67

Youngblood v. West Virginia, 547 U.S. 867 (2006)  59

**Statutes**

17 C.F.R. §201.230                                                   4, 5

**Other Authorities**

Strauss, Audrey, "'Brady' Obligation Extends Beyond Prosecutor's Office,"   60
The New York Law Journal, Nov. 5, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NW YORK

_____

UNITED STATES OF AMERICA

    - against -

                              05 CR 613 (S-5)(JG)

KENNETH E. MAHAFFY, JR.,

       Defendant.

_____

MEMORANDUM OF LAW IN SUPPORT OF KENNETH E. MAHAFFY, JR.'S MOTION
FOR DISMISSAL OF THE INDICTMENT OR, ALTERNATIVELY, FOR A NEW TRIAL

Introduction

           Beginning four days after December 3, 2009, when Mr. Mahaffy was sentenced by

this Court after a retrial on a charge of conspiracy to commit securities fraud, Mr. Mahaffy's

counsel discovered transcripts of depositions of at least twelve witnesses that constitute or

contain exculpatory evidence or leads to exculpatory evidence that should have been but had not

been previously disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963).  All of the

depositions were conducted by two attorneys from the Securities and Exchange Commission

("SEC"), which investigated Mr. Mahaffy jointly with the United States Attorney's Office: (1) an

attorney in the SEC's Enforcement Division in New York, who was cross-designated as a Special

Assistant United States Attorney, participated as one of the prosecutors at the government's table

at Mr. Mahaffy's first trial, and otherwise assisted the government throughout the investigation

and prosecution of this case; and (2) the Chief of the SEC's Enforcement Division in New York,

who testified for the government at the retrial that he conducted depositions of "various

witnesses" as part of the investigation [Retrial at 1797] in setting stage for his testimony about

the deposition of a co-defendant of Mr. Mahaffy's. This Memorandum of Law is submitted on

behalf of Mr. Mahaffy in support of his motion for vacatur of his conviction and dismissal of the

indictment with prejudice on the extraordinary circumstances of this case or, alternatively, for

vacatur of Mr. Mahaffy's conviction and a new trial.

The government's theory of Mr. Mahaffy's criminal liability was that squawk

boxes, internal speakers used by brokerage firms, broadcast confidential customer information

about institutional client's orders; providing clients with contemporaneous access to squawks

was a plain violation of the policies of the brokerage firms, even though squawk boxes were not

expressly addressed in those policies; and that Mr. Mahaffy had been trained on those policies

and violated them knowing that he was enabling the clients to whom he provided those squawks

to benefit at the expense of his employers' other clients.  Before Mr. Mahaffy's first trial in 2007,

the SEC attorneys took testimony from witnesses who contradicted every aspect of that theory,

echoed virtually every argument on the facts made at two trials by Mr. Mahaffy's counsel, and

provided support for Mr. Mahaffy's positions on the admission or preclusion of certain evidence.

Prior to Mr. Mahaffy's first criminal trial, the government knew of more than *ten*

employees of the brokerage firms who believed that squawks were *not* confidential, but the

government failed to identify those employees or disclose their testimony to Mr. Mahaffy.  The

government was also aware of but failed to disclose any information about testimony of

witnesses at SEC depositions that

> • squawkers were trained to protect client confidences precisely so that
> confidential information was *not* broadcast over squawk boxes;
>
> • it was acceptable to disseminate squawks to clients even contemporaneously by
> phone (as Mr. Mahaffy was alleged to have conspired to commit securities fraud

2

by so doing), and even as to trader Warren Fellus, one of the government's specifically-alleged recipients of the purportedly improper broadcasts;

• only sales and position traders (not retail brokers at a branch office like Mr. Mahaffy) were trained on what the government claimed a trial was the only permitted use of squawks: to match buyers and sellers after tailoring disclosures to the particular circumstances of each situation;

• Merrill Lynch managers and senior employees were alarmed upon reading about the government's theory of Mr. Mahaffy's criminal liability in the *Wall Street Journal* and continued to believe even after Mr. Mahaffy's indictment that it was acceptable for a broker to provide a client with contemporaneous access to squawks;

• Merrill Lynch employees, including members of its block trading desk, did not believe it was possible to profit off squawks, and that attempting to do so was "like reading tea leaves;" and

• Jay Amore fabricated his key testimony that he told Mr. Mahaffy that "in case something gets too close to home," Mr. Amore would "trade away" and "pay our bar tab."

This Court should vacate Mr. Mahaffy's conviction and dismiss the indictment

with prejudice for at least four reasons considered together, as explained in greater detail herein:

(1) at least one of Mr. Mahaffy's prosecutors knew or should have known over the course of three years and through two trials that exculpatory material from twelve witnesses had not been disclosed to Mr. Mahaffy, but did not fulfill the government's constitutional obligations under Brady, despite knowing that the suppressed exculpatory material contradicted virtually very aspect of the government's presentation and supported virtually every defense argument made at the trials;

(2) even without the benefit of the suppressed exculpatory material, Mr. Mahaffy was acquitted of twelve of thirteen counts against him at the first trial;

(3) a new trial would cure the undue prejudice from Mr. Mahaffy's unconstitutionally-obtained conviction, but it would not return him to the *status quo ante*; because Mr. Mahaffy cannot go back and use the exculpatory material to get a complete acquittal from the first jury nor demonstrate why the retrial violated the Double Jeopardy Clause, dismissal is the only proper remedy; and

3

(4) the suppression constitutes a violation of the Double Jeopardy Clause because avoiding an acquittal was the only conceivable reason for the government's non-disclosure [United States v. Wallach, 979 F.2d 912, 916 (2d Cir. 1992)], or, alternatively, a fact-finding hearing is required to determine if the government violated the test of Wallach.

Alternatively, if the Court elects not to vacate the conviction and dismiss the indictment with prejudice, the Court should vacate Mr. Mahaffy's conviction and order a new trial.

### Statement of Facts

As set forth in the accompanying Affirmation of Mr. Mahaffy's counsel, incorporated by reference as if fully set forth herein, transcripts of depositions conducted by SEC attorneys Sandeep Satwaleker and Robert Murphy[1] were among 65 cartons of paper documents made available for inspection by the SEC beginning on December 7, 2009, four days after this Court sentenced Mr. Mahaffy. The SEC made the materials available at the direction of the Honorable Robert G. Mahony, the Administrative Law Judge presiding over the SEC's administrative proceeding, which was initiated after the retrial to bar Mr. Mahaffy from any association with both a broker-dealer and an investment advisor. Judge Mahony directed the disclosure in October 2009 to ensure that the SEC complied with its discovery obligations in the administrative proceeding [17 C.F.R. §201.230] before ruling on the SEC's motion for summary disposition based on the jury's verdict at the retrial. By January 7, 2010, the SEC produced thirty transcripts of depositions not previously disclosed, of which twelve constitute or contain evidence or leads to evidence exculpating Mr. Mahaffy.

The government called Mr. Murphy as a witness at trial, eliciting that he had

---

[1] Mr. Satwaleker and Mr. Murphy jointly conducted the twelve depositions at issue on this Motion, except for the deposition of Michael S. Legieza, which Mr. Murphy conducted, and which Mr. Satwaleker did not attend.

conducted depositions of "various witnesses" as part of the investigation [Retrial at 1797] in

setting the stage for his testimony about the deposition of co-defendant Linus Nwaigwe.

Meanwhile, Mr. Murphy and Mr. Satwaleker as government lawyers understood the

government's obligation under <u>Brady</u>: the case is expressly cited in the regulation that defines the

SEC's obligation to disclose exculpatory material in enforcement and disciplinary proceedings.

17 C.F.R. §201.230 (b)(2).

      After Mr. Mahaffy's counsel discovered the first of the thirty transcripts of the

SEC depositions among the 65 cartons of documents, he spoke to Mr. Satwaleker by telephone

and asked whether the SEC's transcripts of depositions had ever been produced to the defense in

the criminal case. Mr. Satwaleker stated that the transcripts had been identified on indices of

SEC documents that had been made available to the defense in the criminal case before the first

trial. Mr. Satwaleker agreed during that telephone conversation to fax copies of the indices to

Mr. Mahaffy's counsel, but never did so. In fact, none of the transcripts had ever been previously

disclosed.

A.    Evidence and Leads to Evidence that Contemporaneous
      <u>Dissemination of Squawks Was Permissible Even to Warren Fellus</u>

      1.  <u>Testimony about "Joe, last name unknown" at Mr. Mahaffy's two trials</u>

      Government witness Warren Fellus testified that he was a trader at A.B. Watley

and subsequently at Millennium Brokerage LLC, a firm started by Mr. Fellus and staffed with

former Watley traders. Millennium was headquartered in Woodcliff, New Jersey, and had a

branch office in Manhattan. Indictment S-5 at ¶13; Retrial at 713, 718. At both of Mr.

Mahaffy's trials, Mr. Fellus testified that he initially believed that trading off squawks was not

illegal in part based on his receipt of squawks from Merrill Lynch broker Matt Schulman and his

colleague, an employee of Merrill Lynch whom Mr. Fellus recalled only as "Joe," and whom Mr.

Fellus understood had a compliance function at Merrill Lynch. First Trial at 1591-92; Retrial at

747.

According to the transcript of the first trial, Schulman and "Joe" stopped

disseminating squawks to Fellus when they concluded that the "risk" of providing the access was

not justified by the amount of commissions that Fellus generated:

Q.    What Merrill broker gave you access to the box?

A.    A man – a guy called Matt Shulman  (phonetic).

Q.    Did Mr. Shulman (phonetic) have a partner?

A.    Yeah, his name as Joe, but I don't know his last name.

Q.    Where – where was their office when they worked for Merrill Lynch?

A.    Somewhere in New Jersey.  It was a New Jersey office.

Q.    How long did -- describe the process of getting – getting the box from
      Matt Shulman (phonetic) and this guy Joe?

A.    It was probably about two weeks, maybe, or so[.]

      He had to get it installed on his desk.  He had to fill out a whole form with
      Merrill, get it installed on his desk, and, you know, and then we –
      meantime, we gotta get the account open on our end, so it took, I don't
      know, a couple weeks.  I'm not sure of the exact time.

Q.    How long did you have the box?

A.    Couple of weeks.

Q.    Why only a couple weeks?

A.    Well, basically, he was looking for large orders, and he wanted a lotta

6

> business, and we, really, I mean, we're a small firm, fifteen, twenty traders, we couldn't give him the business that he wanted, so he called me up one day, and he said: Listen, you know, we're not doing this any more, we're shutting you down.  This doesn't warrant the risk.
>
> . . . .
>
> Q.      What doesn't warrant the risk?
>
> A.      Giving us the box.

First Trial at 1539-40.  Mr. Mahaffy's counsel immediately objected to the testimony as

inadmissible hearsay:

> That was a pretty serious statement made, and, it goes right to the heart of the issue here, and that is: I'll shut it down because I didn't want to take the risk. That means that if the jury believes that occurred, that there's somebody else who believes that Merrill's conduct, the conduct similar to the defendants[] was improper, illegal, et cetera.
>
> We can never cross-examine that person, and so we have very damaging testimony from a person who is not a co-conspirator in our conspiracy, and it's on the record.

First Trial at 1541.  The Honorable I. Leo Glasser, who presided over the first trial, allowed the

testimony to stand, but said he would give a limiting instruction on hearsay.  Id.

Counsel to Mr. Nwaigwe then asked Judge Glasser to reconsider his earlier ruling

that the defense could not elicit testimony that Millennium's compliance officer Chris Rainey

had told Fellus that contemporaneous receipt of squawks was permissible.  The government

responded by purporting to distinguish the irrelevance of Mr. Rainey's view with the relevance of

"Joe's" view.  According to the government, Mr. Rainey was an employee at "a corrupt day

trading firm," while "Joe, *last name unknown* . . . is a broker at Merrill Lynch and he had a view

of this."  First Trial at 1544 (emphasis added).

In summation at the first trial, the government argued that "this Joe individual"

7

and his purportedly dim view of contemporaneous dissemination of squawks provided "the whole picture," which the defense lawyers were obfuscating by claiming that dissemination of squawk boxes was widespread and permissible:

> The risk is that this Joe individual they're talking about is the risk that they're going to get caught.  The risk that Merrill Lynch is going to find out what is going on and they will be fired and potentially prosecuted.

> So when these defense attorneys got up here and argued to you that the boxes are all over the street, [defense counsel] argued that Merrill Lynch's compliance officer approved it, he wasn't showing you the whole picture.  But now you have the whole picture.  You know Merrill Lynch didn't want its brokers allowing people to listen all day every day, unfiltered, to Squawk Box access.

First Trial at 5267-68.

At the retrial, Mr. Fellus testified about "Joe" as he had at the first trial, though the Court sustained an objection when the government sought to elicit "Joe's" statement about risk:

Q.    How did you get the box at Merrill Lynch?

A.    Well, I got a box first, I got a box from a guy named Mat Schulman.

Q.    How long did you have a box from Mat Schulman?

A.    A couple of weeks.

Q.    Was he a Merrill broker?

A.    Yes.

Q.    Did he ever[] come to Millennium's office?

A.    Yes.

Q.    Did he come with anyone else?

A.    Yes, his partner.

Q.      What was his name?

A.      Joe, I only remember Joe.

Q.      And did Joe say anything – when Mat Schulman and Joe came to Millennium's office, did you discuss the squawk box at that time?

A.      Yes.

Q.      Did Joe say anything in connection with the squawk box?

MR. RIOPELLE: Objection, hearsay.

THE COURT: Sustained.

Retrial at 724-25.

2.   SEC Testimony of Joseph Lauricella and Ronald Ledwith

The man described by the government to Judge Glasser as "Joe, last name unknown" and in summation as "this Joe individual" was in fact known to the government because Mr. Murphy and Mr. Satwaleker had deposed him before the first trial. "Joe" was Joseph Lauricella, a Merrill Lynch branch manager with supervisory jurisdiction over Merrill's account with Millennium, who was deposed by the SEC on November 21, 2006. Exhibit A. Further, while the government claimed to Judge Glasser that "Joe" shared the government's view of Mr. Mahaffy's liability, the government knew from Mr. Lauricella's deposition that his view, stated repeatedly and sometimes with exasperation in response to the SEC's repetitive questioning, was that dissemination of squawks was permissible, a view based on what Mr. Lauricella testified to the SEC was the collective view of senior employees at Merrill with "100 years of experience."

On November 20, 2006, the day before Mr. Lauricella's deposition, the SEC

9

deposed Ronald Ledwith, a broker who reported to Mr. Lauricella. Exhibit B. Like Mr.

Lauricella, Mr. Ledwith's name and testimony were unknown to Mr. Mahaffy. Messrs.

Lauricella and Ledwith collectively testified to the SEC that, upon reading a *Wall Street Journal*

article about the indictment of Mr. Mahaffy for providing telephone access to squawk boxes to

Watley and Millennium, Mr. Lauricella spoke to Howard Geiler, a Merrill manager with

compliance responsibilities. Mr. Lauricella spoke to Mr. Geiler because brokers in Mr.

Lauricella's office had been providing contemporaneous access of squawks to Millennium, and

he wanted to ensure that they had done nothing wrong. Mr. Geiler told Mr. Lauricella that there

was nothing wrong with disseminating squawks, explaining that he had confirmed that view after

speaking to senior Merrill employees with decades of experience. Previously when Mr.

Lauricella first became aware of squawk boxes (well before the *Wall Street Journal* article about

Mr. Mahaffy's indictment), he was told by Merrill Lynch's block trading desk that disseminating

squawks was permissible. Mr. Lauricella believed that there was nothing wrong with brokers in

his office putting a cell or regular telephone up to a squawk box.

> Mr. Lauricella testified as follows:

> Q.    Tell us about the conversation you had with Howard Geiler after the Wall Street Journal articles [about Mr. Mahaffy's indictment].

> A.    We called Howie, or I called Howie. I said "Howie, I don't know if you read the Wall Street Journal article, but they are talking about a squawk box in an office, and I want to let you know we have one here and just make sure we do what we need" -- that we are basically looking to get a partner -- we call it at Merrill get a partner.

> That means if something just strikes you as being may, may, may have the slightest effect on you at all, you are supposed to talk to somebody about it.

> [Witness's counsel]: Somebody higher up?

10

THE WITNESS: Higher up, yes.

So I called him and said "we have this -- we had this squawk box in the office. [Financial Advisors] Matt [Schulman] and Ron [Ledwith] were giving out the information to clients, disseminating the information."

Q.      Did you explain to Geiler how they were disseminating the information?

A.      Yes.

Q.      What did you tell him?

A.      I said they were giving it out to him word for word.

Q.      Did you tell him anything more than that?

A.      Not that I remember.

Q.      Did you tell him that they were putting a phone receiver next to the squawk box so that Millennium could listen directly to the audio?

A.      I don't think I used that exact verbiage.

Q.      I am not asking you if you used the exact verbiage. I am asking you if you conveyed the idea that I conveyed in my own words?

A.      I don't know.  I can only use my words and tell you that my recollection is we told him disseminating all the information on the squawk box other than what was not for publication.

Once again, I still don't at this point see the difference between -- and at that point for sure I didn't see -- I didn't even think it was an issue whether or not it was held up to the machine or if someone is just repeating it word for word.

Q.      We could bring the article back later if we wanted, but I think that Wall Street Journal article if we read it would talk about people that put phones up next to a squawk box and let clients listen to the squawk box.

Did you convey to Mr. Geiler the gist of that idea, and that such a thing had happened in the Montvale office?

A.      What I tried to convey is any and all information that was coming across

11

the squawk box, except for what was not for publication[2], was being disseminated.

. . . .

Q.     Did you tell Mr. Geiler that someone put a phone next to the squawk box so that a client could listen to the squawk box?

[Witness's counsel]:  Asked and answered.

A.     I don't remember. I don't remember.

Q.     What did Geiler say, if anything, during that conversation?

A.     He basically said there wasn't -- he never knew of any rule that said you could not broadcast that information.

He had mentioned in the old days people used to actually come into the office and listen to it directly in the office.

He said he would check around and just make sure just to triple check to make sure that everything is okay.

Basically I told Ron, "He is working on it and he will research it and will get back to you on it.  Don't worry about it."

Q.     Did he inquire into the client who was getting access?

A.     I don't know if he inquired, but we told him it was Millennium and Matt.

He had a squawk box in his office too.  Paramus had one before we ever did so he was aware of what a squawk box was, I assume.

Q.     Was there a discussion about the type of business that Millennium was involved in?

A.     No.

---

[2] It is not clear from Mr. Lauricella's testimony what information he believed was expressly made "not for broadcast" or "not for publication" on the squawk box, but the context of his testimony makes plain that it does not include the information that Mr. Mahaffy was charged with disseminating.

Q.      Was there any discussion about how Millennium was using this information?

A.      I don't remember.  I don't think so.

Q.      By "this information," I mean information communicated over the institutional squawk box.

A.      The conversation is along the lines of an article had appeared; was there such a rule as not being allowed to disseminate, because we had never heard of such a rule about not being allowed to disseminate this information, especially after speaking to the desk.

        That was the tenor of the conversation.

Q.      During that conversation you had with Ledwith that preceded this call to Geiler was there a conversation with Ledwith that preceded the call to Geiler?

A.      Not much of one other than did you read the Wall Street Journal article, don't you think we should get Howie on the phone, make sure there was no rule -- is there a rule that was broken.

Q.      At any point did Ledwith tell you that he placed a phone receiver next to the squawk box?

A.      Yes, he told me that.

Q.      When was the first time he told you that?

A.      I don't remember.

Q.      Was it approximately the time of the Wall Street Journal article?

A.      I don't remember specifically. I know this is a very important point, and I know  you have your opinion and you are making it very clear, but at this point it is sort of like splitting hairs. I don't see the difference between the two.

Q.      What else did Ledwith tell you about putting a phone receiver next to the squawk box?

A.      Basically he was disseminating all the information to Millennium, and he was turning it off whenever not for broadcast came over.  Then when he left the office he would turn the whole thing off.

13

I want to say it was a three-month period.

Q.      What was a three-month period?

A.      This relationship from start to finish including the beginning, the end, the whole thing.

Q.      The relationship with Millennium?

A.      Yes . . .

Exhibit A at 72-75.

Q.      Was there any follow-up to the conversation you had with Geiler?

A.      Yes.  Howie said he was going to research it.  He said he had never heard of such a rule.

He talked about in the old days they used to let the clients come in and listen.

He spoke about how he is going to triple check and make sure there is no rule or anything like that, and he was going to reach out to some more people in compliance just to make everyone -- make sure all the bases are covered on this and we can move on.

That was -- that is not a quote, but that is the flavor of the conversation.

. . . .

Q.      Okay.  So Geiler told you he is going to look around, et cetera.  Was there any follow-up?

A.      Yes.

Q.      What was that?

A.      Howie called back or sent an e-mail and/or both and basically said he checked all the rules.  No one has ever heard of a rule.

I believe he said he checked with Tom Timmerman, who is like a senior audit guy who has been around for like 30 years or 40 years.

He said he checked with somebody else as well, who also was in the

14

business like 30 years.

Between all of us, basically like 100 years of experience, and he said he never heard of a rule that you can't disseminate the information on a squawk box.

So that was sort of that.

Exhibit A at 76-77.

Q.    At the time 2003, 2004, did you consider any of the information transmitted over the squawk box to be confidential?

A.    No.

[The witness's counsel]: Any of the information is what he asked.

A.    Any of the information confidential?   Yes. Some of the information was confidential.

Q.    Tell me about what specific pieces of information communicated over the institutional squawk box you believed to be confidential during the 2003, 2004 period.

A.    I don't know if it was considered confidential, but I know it was not for broadcast.  There was a portion of the information that would say this is not for broadcast.

Q.    What portion of the information was attached to this this phrase "this is not for broadcast"?

A.    It was either -- sometimes they did a conference call over it, or sometimes they would give a quote after that or appear to be giving a quote.

Q.    What was the -- give me an example of such a quote that was attached to this phrase -- what was the phrase, again?

A.    I think they would say "not for broadcast" or "not for dissemination," or "not for something.

Q.    Give me an example of --

A.    I don't know specifically, because I don't know if I ever heard them say that.

15

Q.      You say you are not sure you ever heard them say that?

A.      Right.

Q.      So how do you know that that was an attribute of the squawk box?

A.      Because I called down to the desk asking them about the squawk box, and I wanted to become more educated as to what is going on with this thing.

Q.      What desk?

A.      The block desk, block trading desk.

Exhibit A at 40-41.

Q.      During the time that Millennium was a customer of Merrill Lynch's, did you know that any Merrill Lynch employee was allowing Millennium to listen to the contents of the squawk box via a phone line?

A.      I know they were giving out or disseminating the information to them.

Q.      Please just answer my question.

[Witness's counsel]: He actually was. Let him finish.

A.      I knew they were disseminating the information to them directly.

I also had called the [block trading] desk during this whole thing with the problem with the execution trade, and I spoke to them in great detail about the trade, the dissemination, the e-mail and the format.

The terminology I used, whether or not I said they were using a direct line connection or repeating it, this and that, I didn't see the need to tell them the difference between the two. I don't see the difference between someone going like this with their hands, talking, talking, talking, talk, talk, talk, or doing this. It didn't dawn on me to do that.

Q.      There were a lot of hand gestures in that answer.

A.      At that time I did not see the difference between listening to the information and then repeating it back word for word versus just having the speaker next to it and listening to it word for word.

Q.      You said that you knew during the period that Merrill Lynch employees were conveying the institutional squawk box information directly to Millennium?

16

A.    Yes.

Q.    What did you mean by that?

A.    They were giving -- my understanding is they were giving them all the information word for word except for what is not for publication.

I was told by the desk that you can do that.

Q.    During that period, did you know that Millennium was allowed to listen to the institutional squawk box transmission?

A.    I know they were allowed to listen to it.

Whether it was a function of it repeating or just putting the phone next to it, I don't know.

Q.    Did you know that during that period the Millennium was able to listen to the sound of the Merrill Lynch institutional squawk box?

A.    They could have in theory.

Q.    No.  Did they?  Did you know it?

A.    I don't remember specifically how they were giving them the information at that point in time.  I can't tell you definitively I knew specifically how they were giving them the information other than to say we spoke to the desk. The desk told us we can give all that information out except for not for broadcast.

I would never think to make a delineation or think there was any difference between them repeating it back word for word or letting them hear it first-hand as long as they were turning the machine off.

[Witness's Counsel]: when you say turning the machine off, in what context?  As long as they were turning the machine off?

A. When it is not for broadcast.  I don't see the difference, and I still don't see the difference in all honesty at this point.

. . . .

Q.    The part of the conversation I want you to describe to me, Mr. Lauricella, is the part where I believe you testified someone on the institutional desk told you that it was okay to repeat word for word whatever came over the institutional squawk box with the exception of that information that was attached to the phrase not for dissemination.

17

A.      Right. You are not allowed to say what is not for publication.

. . . .

Q.      Was there discussion about whether it is okay to repeat what is on the squawk box word for word?

A.      Except for what is on not for publication.

Q.      I am asking about that part of the conversation.

A.      Okay.  How can I make that clearer?

Q.      Do you have a recollection of how that conversation went?

A.      It was basically the same thing, that the information on the squawk box can be disseminated except for the portion that says you are not allowed to do it.

Exhibit A at 65-68.

Q.      Explain what you mean by putting a squawk box next to a telephone.

A.      Rather than repeat it word for word, they would just hold it next to it.

Q.      Hold the --

A.      Telephone next to it.

Q.      And the telephone -- explain to me what was happening as a result of that.

A.      Well, originally they would just say okay. They would hear 100 shares of IBM for sale, and then they would say 100 shares of IBM for sale into this telephone.

Eventually rather than just repeat it, they just put the 100 shares of IBM for sale next to the telephone so they would directly be played to the guys at Millennium.

Q.      So there was a telephone connection open to Millennium whereby Millennium could hear the content of the squawk box directly?

A.      Except for not for publication.

They would turn it off when that happened.

18

Q.    What is your basis for understanding the things that you just conveyed to us?

A.    After all this happened I sat down with Ron Ledwith, and we went through what is going on, what happened, do you remember, talk to me about it and the whole 9 yards talking about it.

Q.    When you say "after all this happened," what do you mean?

A.    The wall Street Journal ran articles about the squawk box.

Exhibit A at 59-60.

Q.    Anyway, you did tell Mr. Geiler that the cell phone was used in connection with the squawk box and Millennium?

A.    I believe I did. I don't know for sure. Once again, whether it was the cell phone or the regular phone, I never thought twice that dissemination of the information was this big issue.

So whether it was the cell phone or regular phone, I don't know.

Exhibit A at 100.

The testimony of Mr. Ledwith was in even more stark in establishing the view of senior Merrill employees that providing telephone access to squawks was permissible. Some of these views were expressed even after the *Wall Street Journal* published an article about Mr. Mahaffy's indictment.

A.    Matthew Schulman asked for a squawk box. He indicated that hedge fund clients – he had institutional clients that were already receiving the feed. He indicated – Matthew Schulman indicated that Paramus already had an institutional squawk box. The client that he brought to the table, Millennium, was well known to him. His father worked there, his best friend was the general manager.

[Witness's Counsel]: Is he telling you this?

[A.]    Yes, sir,

. . . .

19

[W]e were under – Joe and I felt – Matthew positioned the situation as if we didn't do it, somebody else would, that Millennium was already getting feeds from our houses on the street and that if we couldn't get one, they would get it somewhere else at Merrill Lynch.

Exhibit B at 46-48.

Q.      So can you describe, if not by name then by position or function, the person in the institutional business with whom you spoke regarding the squawk box?

. . . .

Did you ask this person if it was okay to provide direct access to –

A.      Yes, sir.

Q.      The squawk box feed to the outside client?

A.      Yes, sir.  I asked how the information could be disseminated.  He said some people just pick up the phone and call their clients all day long.

I asked specifically because this is what Matthew was talking about, could we provide a phone line or direct feed.  I don't remember the exact word.  The answer is that's how other people do it, are doing it.

Q.      When you had the call with the person from Merrill Lynch about the use of the squawk box, did you clearly refer to the concept of putting a phone next to the squawk box speaker and having an open phone line to a non-Merrill Lynch person?

A.      I thought I did, yes.

Q.      What is your impression of what the person at Merrill Lynch told you regarding such a practice?

[Witness's Counsel]: His impression?  Why don't you ask him what he said?

Q.      What did the guy say?

A.      That's how other people do it.

20

Q.     And what is your impression of what he meant by that.

. . . .

A.     My understanding is that this was no problem.

       My second understanding is that this fit exactly with what I heard from Matthew, that other feeds are being done, this is how our institutional business is done.  I didn't give it a second thought.

Exhibit B at 71-73.

Q.     So the article in the press, did you read the articles about charges brought against brokers relating to squawk boxes.

A.     Yes, sir.

Q.     That scared you to read those articles?

A.     Yes.

Q.     So when you first saw those articles, whom did you first speak with?

A.     Howie Guiler.

Q.     How about anyone besides Mr. Guiler?

       Did you speak to Mr. Lauricella, for example?

A.     Absolutely. Sorry.

Q.     What did you all say to each other?

A.     This is crazy.  What's going on here?  We've got to talk to Howie. Which is what we did

. . . .

Q.     Could you tell us about the conversation or conversations that you had with Mr. Guiler?

A.     Joe acting now as a manager said, hey, you know, what's going on here? Ron is very upset.  Because it was in my office, the others had boxes but the

phone was in my office.  Is very upset.  So Howie's comment –

. . . .

His comment was he never heard of anything like that.   You know, this was not bribery, whatever.  This doesn't make – you know, I've never heard of a prohibition on using the box.

He then went and talked to a few other people, his supervisor, who is Tom Tiedman, I believe, T-I-E-D-M-A-N, I believe who had also not heard - -

[Witness's Counsel]: Wait.  How do you know he did nor hear?

[A.]    Howie told us.

. . . .

Q.    When you called Mr. Guiler, did you explain to him the whole arrangement with Millennium?

A.    Yes, sir.

Q.    And did you explain to him how you had taken the phone off the fax machine and put it next to the squawk box so Millennium could hear it?

A.    Yes, sir.

Q.    What did Mr. Guiler say?

A.    He said let me get back – I don't recall specifically at this point other than I have to check it out.  But I don't think there's a problem.

. . . .

Q.    What was the second conversation you had with Mr. Guiler, the follow-up?

A.    He reported back that nobody else had heard to that effect.

Q.    Did he say to whom he had spoken to?

A.    I know he spoke to his boss.

22

Q. Who was that?

A. Tom Tiedman.

Q. You know because he told you that?

A. Yes.

Exhibit B at 77-81.

3. The Prejudice to Mr. Mahaffy of the Non-Disclosure

The undisclosed depositions of Messrs. Lauricella and Ledwith require vacatur of

Mr. Mahaffy's conviction for the following reasons considered alone or together:

- they constitute or contain evidence and leads to other evidence that squawks are *not* confidential, as more fully discussed in Section B hereinafter;

- they provide evidence and leads to other evidence that senior Merrill Lynch personnel believed it consonant with company policy to permit contemporaneous dissemination of squawks, and even to Warren Fellus, one of Jay Amore's traders at A.B. Watley who thereafter became the principal of Millennium Securities;

- testimony that branch managers and compliance officers at Merrill Lynch approved dissemination of squawks as consistent with Merrill Lynch's policies underscores the validity of Mr. Mahaffy's arguments that his intent to defraud and lack of good faith could not be established without the testimony of at least one of his branch managers or compliance officers at Merrill Lynch (Tom Brown and Benjamin Grimaldi) or Smith Barney (Tom Isaacs and Linda DeMartino);

- evidence that members of Merrill Lynch's block trading desk approved of contemporaneous dissemination of squawks as consistent with Merrill Lynch's policies underscores the validity of Mr. Mahaffy's argument that his good faith was demonstrated by his encouragement to Watley traders that they do sufficient business to qualify for his employers' block trading desks; and

- the testimony of Mr. Lauricella and Mr. Ledwith that they provided Millennium with access to squawks for three months (and not just a couple of weeks because "Joe" was concerned about "risk," as Mr Fellus testified) shows that Mr. Fellus lied after entering into his cooperation agreement and was completely unworthy of

23

belief.[3]

B.     Evidence that Squawks Did Not Contain Confidential Customer Order Information

        The government's theory of liability at both trials was predicated on the purported

confidentiality of squawks.  Both Judge Glasser at the first trial and this Court at the retrial  so

instructed the jury.  First Trial at 5428-29; Retrial at 2576-77.

        As the government argued in summation at the first trial:

> Let me quickly summarize this scheme, the scheme that you have heard so much
> about by now.  That these three stockbrokers – Mr. O'Connell, Mr. Mahaffy and
> Mr. Ghysels, that they took *confidential information* that was inside their firms
> about impending institutional sales, institutional buys, institutional customers
> orders, essentially. [A]nd they took that information from their employers, the
> Squawk Box information, and they sold it.

First Trial at 4732 (emphasis added).

> The property that the defendants' actions deprived Merrill Lynch, Smith Barney
> and Lehman Brothers and their clients is known as *confidential information* about
> the customers orders that went over the Squawk.

First Trial at 4734 (emphasis added).  See First Trial at 2732 (the government argued to Judge

Glasser, "[t]he issue is whether or not the information that was misappropriated was confidential

. . . . "); First Trial at 3940 (the government argued to Judge Glasser that squawks were "clearly"

confidential based on "a whole series of clear and undisputed policies"); First Trial at 336 (the

government said in opening: "That goes on all day long, a steady stream of Merrill Lynch's,

---

    [3] See Mahaffy Reply in Support of Motion Pursuant to Rule 29 at 12-15 (detailing Mr.
Fellus's contradictory statements about whether Mr. Mahaffy or Mr. O'Connell asked about Mr.
Fellus jumping ahead of orders; whether any such question was incriminating or expressed the
questioner's hope that Mr. Fellus was <u>not</u> doing so, as Mr. Fellus testified at the first trial; and
the abrupt change in Mr. Fellus's testimony about the frequency with which Mr. Mahaffy
encouraged him to step up to the block trading desk – after Mr. Mahaffy opened on that point,
and the government immediately telephoned Mr. Fellus and questioned him about that frequency.

Citigroup and Lehman Brothers's employees are squawking their customers' confidential order information");

At the retrial, the government made the same arguments in opposing the defendants' motion pursuant to Rule 29:

> Obviously, the Court has previously indicated that the understanding of our theory of prosecution that the information was confidential and proprietary as testified to by the brokerage firm employee witnesses, that it was not supposed to be distributed outside the firm, that there was an arrangement between the defendants and the Watley defendants and the broker defendants to pay commissions as a form of corrupt bribe to induce them to share this information, it was not supposed to be shared, and that was a violation of the duties that were owned by the employees to their employers. The information also further was confidential. Manual[s] say its confidential. They all get trained that it's confidential . . . .

Retrial at 2032.  The government argued in summation:

> [The defendants] cannot dispute that what comes over the box is confidential information from the brokerage firms.  Because you heard that.  Mr. Mulholland from Merrill Lynch, Mr. Devlin from Lehman Brothers, Mr. Molnar from Citigroup Smith Barney, they told you what comes over the box , that it's confidential.  Not all of it is confidential but a lot of it is confidential.

Retrial at 2495.

> This is confidential information of an employer.  People who work for companies know that they are not allowed to distribute their employer's information outside the firm.  And every single one of these policy manuals said that.  Every single one.  You don't need the policy manuals because it's basic common sense.

Retrial at 2497.

> So all this talk you have heard in this trial about indications of interest or analyst information or upgrades and downgrades, market color, being able to call into an eight hundred number to get access to a squawk box, FINRA rules or the middle markets desk, those are all diversions.  Those things are designed to distract you and confuse you.  It is about pending – the confidential information, pending, unexecuted large block orders.  That's what we're talking about and that's what this case is about

Retrial at 2154-55.

> Each one of the firms had a policy relating to confidential information and each of the policies was clear.  Smith Barney's Molnar called it broker 101, order flow information was confidential, what he called a very basic concept.

Retrial at 2183.  <u>See</u> Gov't Letter of Nov. 25, 2009 at 3 ("By leaking the squawk box information without the consent of their Brokerage Firm employers, the Broker Defendants deprived the Brokerage Firms of controlling the manner and time in which thee information is disseminated"); U.S. Attorney's Press Release of Apr. 22, 2009, Announcing Convictions[4] ("The government's evidence at trial established that between 2002 and early 2004, [brokers including Mr. Mahaffy] routinely provided day traders . . . with confidential customer order information").

While the government was making all these arguments, it knew of and failed to disclose the fact of at least *ten* people who did not believe that squawks contained confidential information.  The above-quoted testimony of Mr. Lauricella and Mr. Ledwith identifies at least six of them:  Mr. Lauricella and Mr. Ledwith themselves; Howard Geiler from Merrill Lynch's compliance department; senior Merrill Lynch employee Tom Timmerman or Tom Tiedman (assuming from context that Mr. Laurciella and Mr. Ledwith were referring to the same person, but one of them misstated his name); the unnamed senior employee of Merrill Lynch with at least thirty years of experience to whom Mr. Ledwith referred; and at least one member of staff on Merrill Lynch's block trading desk.

Apart from those six people, the SEC's deposition transcripts establish the fact of at least four other people, representing all three of the brokerage firms at issue in this case, who did not believe that squawks contained confidential information:

---

[4] www.justice.gov/usao/nye/pr/2009/2009apr22.html.

1.    Brian P. Hull of Merrill Lynch, deposed on November 1, 2006;

2.    Leo Arthur Ressa of Merrill Lynch, deposed on January 24, 2007;

3.    Robert Moore of Smith Barney, deposed on August 11, 2005; and

4.    Michael S. Legieza of Lehman Brothers, deposed on November 15, 2005.

1.  <u>Brian P. Hull of Merrill Lynch</u>

Echoing Mr. Mahaffy's view that squawks did not reveal customer identities and were intended to be disseminated, Brian P. Hull's view was that squawks were not confidential for precisely those reasons:

> Q.    Do you consider the information concerning an order communicated over a squawk box to be confidential?
>
> A.    I believe it's confidential information as to who the client is, but when you go over the squawk box to a larger community, knowing that the people that are going to hear that are going to then make several calls each hoping to find the other side, that information will get spread or be out in the marketplace or broader.
>
> Q.    So what is your opinion about the information concerning an order, aside from the client's identity?
>
> A.    I think that the client identity is very confidential. I think what part of the order you chose to share with the market, while it's confidential between who the client is, once you make that call and start to call other clients letting them know that you're a buyer of an individual security, that part of the order that you're showing to the marketplace is no longer confidential, just as if you were working it on the floor of the stock exchange and showing it into the crowd that you were a buyer and displaying it on the book, it's no longer confidential.
>
> Could I address your question just to be more complete in my answer?
>
> Q.    Sure, go ahead.
>
> A.    The other thing I would add is that the client who gave you the order has an understanding that you are out, you know, to explain that order or at least part of that order to a broader marketplace, just to address your question of confidentiality.

. . . .

Q.     I want you to answer my question just a little bit more directly. I asked you if, in your opinion, information ceases to be confidential once it's announced over the Merrill Lynch squawk box, information regarding a pending customer order?

A..     I would say it's confidential information as to who the client is and the order is confidential, but it's displayed or it's shared with the marketplace, with the client's understanding that that's what's taking place.

Does that answer your question?  It's hard to give a one word answer to that question.

[Q.]     Well, it sounds to me like you're saying it's no longer confidential in your view?

[A.]     I'm saying who the client is, is confidential, but that order is in the marketplace.  So if by being in the marketplace, with the fact that we're a buyer of Chrysler is no longer confidential, I would agree with that.  But the client that gave us the order, we protect that client's identity.

[Q.]     I'm not talking about the client's identity.  I'm talking about the existence of an institutional block order of a size that could potentially impact the marketplace.

[A.]     I would suggest that –

[Q.]     That's no longer confidential after it's announced over the squawk box?

[A.]     And one of the reasons I would say that is because it's shared with – we have gone out to a large number of clients and shared that with them and most likely the trader is already representing that order in the marketplace, in the public marketplace.  In this case we used the New York stock exchange as an example, the trader would be down there representing that order.

. . . .

[Q.]     One of the things that I think you said is there may be something that does over the squawk box that you don''r want to give to a client.  DO you know of anything that goes over the squawk box that Merrill does not want to give to a client.

[A.]     Not that I can think of.

28

. . . .

After the squawk box incident became public, which obviously I had no idea of, we made sure to tell our salespeople that even if you're on the phone and the squawk box goes over, make sure you don't even go like this. Sorry, I'm using a hand gesture, but just too make sure that the only way you communicate is after you hear something over the squawk box, that you dial the client and give them the information . . . .

[I] did have a conversation to say, just make sure that you're calling your client directly, and that if you're on the phone, you know, do not let the client hear directly – you know, try to make sure that they're not hearing it live.

[Q.]   What's wrong with that?

[A.]   I don't think there's actually anything wrong with it, but I just thought given the increase awareness that something had happened, I thought being as conservative as possible was the right decision until we got clarity as to whether that was okay or not.

[Q.]   When you refer to something that's happened, what are you talking about?

[A.]   The article in the paper that someone was leafing the phone off the hook and allowing somebody to listen to the squawk box as things came over them.

Exhibit C at 8-18.

   2. Leo Arthur Ressa of Merrill Lynch

Leo Arthur Ressa was the head trader for Merrill's trading desk for New York and New Jersey from late 2001 to early 2002 before heading international trading in New York beginning in 2003. Exhibit D at 6-7. When Mr. Ressa, after the SEC's investigation in this matter had begun, did a survey of Merrill's squawk boxes, he did not consider his task to relate to confidentiality because confidential customer orders were not squawked:

Q.   Are you aware of any Merrill Lynch policies concerning confidentiality of customer information?

[A.]   Can I ask in what context? Because I am sure there are many policies and

29

procedures on confidentiality of customer information.  So yes, I am aware of policies and procedures on confidentiality with clients.

[Q.]    Well, can you just tell us what your understanding of such policies is?

       [Witness's Counsel]: Do you mean as they relate to the squawk or as they relate to ordering information?

[Q.]    That's what we are talking about today, the squawk box, so obviously that's one thing I am interested in, customer order information that's conveyed over the squawk box, but I think it would be helpful if you could describe your understanding at Merrill Lynch policies and confidentiality policies and whatever context you know about it.

[A.]    Client confidentiality is always, you know, it's policy procedure to not divulge to any other client what one client is doing.

       So I would never tell client A what client B was doing. Those sort of confidentiality practices were well in place.

[Q.]    Since when?

[A.]    Forever.

[Q.]    And how did you know about those policies?

[A.]    Through training, through practice and procedure.  I am sure you could find compliance e-mails that deal with this subject and remind people about client confidentiality. I don't recall any specific ones, but I am sure that there are client confidentiality e-mails and client confidentiality meetings that was mentioned at a compliance meeting, things of that nature.

[Q.]    Any other specifics about that policy or how it applied to your work at Merrill?

[A.]    Only that you would never share a client's name with another client.

[Q.]    A client's name?

[A.]    Right.

[Q.]    Was the policy limited to the client's name?

[A.]    Well, the client's identity attached to what they were trying to get accomplished.

[Q.]    But apart from a client's name, were there any policies regarding orders and the confidentiality with regard to information concerning customer orders without reference to a particular customer?

[A.]    No.  You would have a client come in, I want to buy or sell a stock. The orders you are referring to, you would use your professional skill to try to find the other side of that order, but at no point would you say client A wants to buy this stock. You would say I have a buyer of --

[Q.]    What about policies concerning front-running?  Do you know what the term front-running means?

[A.]    I do.

[Q.]    Tell me what you think the term front-running means in your business.

[A.]    In my definition of front-running, that would mean somebody buying a stock ahead of another order, ahead of somebody else's order, somebody else's buy order or selling stock ahead of somebody else's sell order.

[Q.]    Are you aware of any Merrill Lynch policies that pertain to front-running?

[A.]    Sure. I don't know what the exact policy is, but front-running, I think in the Series 7 and series 55, front-running is illegal.

[Q.]    What about the term "trading ahead"?

[A.]    I believe that's the same as front-running.

[Q.]    Did you ever receive training at Merrill about policies concerning front-running or trading ahead?

[A.]    Training?

[Q.]    Trading ahead.

[A.]    You asked me if I ever received any training?

[Q.]    Yes.

[A.]   Specific training as pertaining to front-running?

[Q.]   Yes.

[A.]   I don't recall ever having specific training, but all your training was done on the job learning from the professionals that were there for you.

[Q.]   So when you did this inquiry into who had access to the squawk box, did you relate those policies either concerning confidentiality or front-running to this issue concerning squawk boxes?

[A.]   I did not relate and I would not relate it to client confidentiality because I don't believe that anybody ever went on the squawk with a client name.

Exhibit D at 58-61.

   3. Robert Moore of Smith Barney

      Robert Moore was a position trader[5] at Citigroup from 1983 to 1991, when he

became co-head of the listed trading desk.  In 1993 he became head of all NASDAQ trading and

sales.  In 1998, he became one of three heads of global trading.  In 1999 he became head of U.S.

equities, responsible for institutional business.  In about 2001 he became head of global

technology, e-commerce.  In late 2003 he became head of U.S. cash trading.  Exhibit E at 9-12.

      Echoing Mr. Mahaffy's defense, Mr. Moore testified in substance that the nature

of squawks disqualified them as confidential:

      Q.   Did you consider information conveyed over the institutional block hoot to be confidential Smith Barney information?

      [Citigroup Counsel]: Objection.  Can you describe which information?  He described a lot of information that went over the hoot.

      Q.   Information concerning block trades?

      A.   I think it was sensitive information.  Because I am not a lawyer, I have

---

   [5] Position traders are the employees who broadcast the actual squawks.

never been a lawyer, I don't know what the definition of confidential is.[6]

The reality of it is that when you purchase - - when you advertise, at some point, you are going to have to act on that order, so I go down to the floor of the New York Stock Exchange, one could see that Citigroup is buying that stock.

In the NASDAQ I have to life the stock, so someone could see that Citigroup is buying it. I do not know the definition of confidential. I would say that the information, in my opinion, is sensitive, not confidential, because you are going to have to do something with that order anyway. So if it was never used someone could see you buying it within a minute later, just by using your name.

That would be answer to that.

Q.    So when you say that it's sensitive, sensitive to who? What do you mean by using the term sensitive versus confidential?

A.    The sensitivity of it is the job of every capital markets person in equities was to execute an order, any order, with the least amount of market impact.

That's every single – that's the mandate of everyone on that floor that is a sales trader and a trader. That's what you are trying to achieve. The fact that the information on the hoot and holler is sensitive , what I mean by that is the possibility of information going out and either the order not being handled properly by the broker or the floor that doesn't handle it correctly or upstairs has the potential where the price impact will be greater as opposed to not using the hoot and holler.

Exhibit E at 30-32.

4.  Michael S. Legieza of Lehman Brothers

Michael S. Legeiza served Lehman Brothers at various times as co-operational

head of the New York office, administrative manager of the New York office and Business

---

[6] In opposing Mr. Mahaffy's application for his continued release in which Mr. Mahaffy cited Mr. Moore's testimony, the government seized on Mr. Moore's testimony that he was not a lawyer as somehow neutralizing the materiality of his testimony. Govt Opp of Jan. 11, 2010 at 13. Mr. Mahaffy, of course, is likewise not a lawyer, and the policy manuals on which the government predicated its case speak to "confidential" customer orders. .

Control Manager for private investment management of Lehman Brothers.  Exhibit F at 7-8.  Mr.

Legeiza testified that information communicated over institutional squawk boxes was not

confidential:

> Q.      Was the information conveyed over the institutional block hoot
> confidential?
>
> A.      I don't believe it was confidential . . . .
>
> Q.      Do you think the information conveyed over the institutional block hoot
> was, even if it was not confidential, was it at least the property of Lehman?
>
> A.      I don't know what the purpose of having a hoot system would be if it
> weren't to facilitate the communication of information to the appropriate people
> within the organization then ultimately to our customer base.

Exhibit F at 30-31.

> Q.      At the time when you were admin manager and you were in the position of
> approving TSR requests for access to the institutional hoot, was it your belief that
> the information conveyed over the institutional hoot was confidential?
>
> A.      No.
>
> [Q.]     Did anyone ever tell you that the information was confidential?
>
> [A.]     No.

Exhibit F at 60.

All of this testimony was at odds with the theory on which government's case was

wholly predicated:  that squawks contained confidential customer order information, and that it

was plain from the firms' policy manuals about such information that disseminating squawks

was a plain violation of those policies.